Indictment for maihem and assault and battery, removed by the defendants from the Court of Oyer and Terminer for Philadelphia county.
The indictment consisted of four counts, the two first being under the act of assembly passed on the 22d April 1794.
The first count stated, that Eangcake contriving and intending Jonathan Carmalt a citizen of Pennsylvania to maim and disfigure, with force and arms, &c. on purpose and of his *415 malice aforethought and by lying in wait on the 13th August 1794, at, &c. unlawfully and feloniously did make an assault on the said Jonathan with a cart whip of the value of is. and the right eye of the said Jonathan then and there did strike and put out, with an intent in so doing to maim and disfigure him, against the act of assembly, &c. and that Hook was then and there present aiding and abetting the fact, &c. against the act, &c.
The second count was grounded on the latter part of the 6th section of the act of 22d April 1794 (pa. 601,) and pursued the words of the first count, leaving out the words ‘ ‘ and by lying in wait” and charging the fact to have been done “voluntarily, and maliciously and of purpose,” both against the principal and accessary.
*The third count stated that Langcake and Hook r^ig contriving to maim and disfigure Jonathan Carmalt in L the peace of God and of the commonwealth then and there being, the said Langcake on the 13th August 1794, at, &c. voluntarily, wickedly, maliciously, unlawfully and feloniously did assault the said Jonathan, and him with a cart whip which he in his right hand had and held, the right eye of the said Jonathan, then and there voluntarily, &c. did strike and put out, with intent in so doing to maim and disfigure him, and that Hook, at the time of the felony by Eangcake done and committed voluntarily, &c. was present aiding and abetting the said Langcake in the felony aforesaid, &c. concluding as in maihem at common law, against the peace, &c.
The fourth count, was a general charge against both defendants of assault, battery and wounding, .at common law.
The defendants were admitted to their challenges of the jurors returned, under the 16th section of the act of assembly, and joined in their challenges. The evidence on the part of the commonwealth, disclosed a great variety of aggravated circumstances against the defendant Langcake. Hook was his apprentice, and was supposed to have acted by his command. But one Thomas Langcake, the father of the defendant Langcake, appeared to have been very active in the atrocities committed, and had been recognized with the others to answer the charge. He had died before the time of finding the indictment in the Court of Oyer and Terminer, and his declarations shortly before his death, were now offered in evidence by the counsel for the defendants.
They urged, that the declarations of a dying person were deemed equivalent to an oath, and had been frequently received on the trials of indictments for murder; that the prosecutor being entitled under the act of assembly to three fourth parts of the fine to be assessed by the court on conviction, would probably be induced to state the facts in their strongest colours, and therefore any evidence tending to invalidate his testimony, though as to collateral matters, ought *416 liberally to be received; and that Thomas Eangcake, if not indicted and living, would certainly be a witness either for or against the prosecution.
But the whole court resolved that these declarations could not be received in evidence. The general rule was, that hearsay was inadmissible, but there were some exceptions in particular cases, and among others the declarations of the deceased person on an indictment for murder, founded prin-*4171 cTally on the neces*sity of the case. No such neces-J sity could be pretended here, there having been several witnesses present at the different transactions. It would lie on the defendants to establish the evidence contended for, as an exception from the general rule, which cannot be done.
But independent hereof, Thomas Eangcake was bound over to answer the charge. His mind must have been impressed therewith, and he would naturally make his story as plausible as he could. A considerable weight of testimony appears against him, and the grand jury would, in all human probability, have found a bill against him, if he had been then living. If indicted and alive, Thomas Eangcake could not be admitted a witness to disprove the present charge. His declarations shortly before his death surely cannot be received in evidence, and are consequently overruled.
The cause was very ably and ingeniously argued by Messrs. Thomas and Porter on the part of the state, (Mr. Ingersoll, the attorney general, being sick,) and by Messrs. Rawle and Moses Eevy on the part of the defendants. And M’Kean, C. J. having explained the different counts in the indictment, and summed up the evidence to the jury, delivered to them the charge of the court.
To convict the defendants of the three first counts, malice must be proved or collected from the whole circumstances of the case. The defendants may express it either by their words or actions. This word has been differently explained by different law writers, but it is clearly agreed, that malice in a legal sense is not to be restrained “to a principle of malevolence to “particulars,” according to the modern use of the word, 1 Hawk. 80, § 18. Fost. 256. Malice is a design formed of doing mischief to another. Kely. 127. He that doth a cruel act voluntarily, doth it of malice prepensed. 3 Inst. 62. Such cases as are accompanied with those circumstances that shew the heart to be perversely wicked, are classed as malicious. 1 Haw. 80, § 18. An express evil design is the genuine sense of malitia. 4 Bl. Com. 199. All the cases of implied malice turn upon this simple point, that the fact hath been attended with such circumstances, as carry in them the plain indications of a heart regardless of social duty, and fatally bent upon mischief. Fost. 257. These expressions, however diversified, clearly evince, that those acts shall be deemed malicious, where the attendant circumstances are the *417 ordinary symptoms of a wicked, depraved, malignant spirit. Fost. 256.
The first clause of our act of assembly of 22d April 1784, § 6, is borrowed from the words of the British statute of 22d and *23d Car. 2, c. 1, § 7. It pursues the same lan- p^io guage, except that our act particularly enumerates the cutting off “the ear,” and mildly varies the mode of punishment. Under that statute, commonly called the Coventry Act, it has been adjudged not necessary that either the malice aforethought, or lying in wait, should be expressly proved to be on purpose to maim, or disfigure. Reach’s Cas. 193. (Tick-ner’s case.) And also that he who intends to do this kind of mischief to another, and by deliberately watching an opportunity, carries that intention into execution, may be said to lie in wait on purpose. Ib. 194. (Mills’s case.)
Under the first clause of the act of assembly, no intent to maim or disfigure in a particular manner is necessary, and therefore on the first count in the indictment, if the general intent is established to the satisfaction of the jury, their next material inquiries will be, as to the malice and lying in wait, whether the same has been proved,- or can fairly be inferred from all the circumstances which have been disclosed in evidence.
The second clause of the 6th section of the act goes further than the Coventry act, and was evidently introduced to prevent the infamous practice of gouging. The words are very comprehensive, and extend to pulling out, or putting out the eye, while fighting or otherwise. But we hold it necessary in order to convict on this clause, that a specific intent to pullout, or put out the eye,, must be shewn to the satisfaction of the jury. We apprehend, that the evidence will scarcely warrant the conviction of Rangcake on the second count; and though Hook has behaved himself grossly amiss, during the whole transaction, yet he cannot properly be convicted on either of the two first counts in the indictment.
Of the third and fourth counts, Rangcake is admitted by his counsel to be guilty, and perhaps the evidence will suffice to reach Hook on these two last counts.
But it is the duty of the jury to consider and weigh all the testimony, as to each of the defendants on the different charges, and pronounce such verdicts as may be satisfactory to their own consciences.
The jury withdrew, and returned to the bar in about one hour, and found Rangcake guilty on the first, third, and fourth counts, and not guilty on the second count. They acquitted Hook of the first and second counts, and convicted him of the two last counts.
Sentence was afterwards pronounced against Rangcake, that he should undergo a confinement in the gaol and penitentiary house for three years, the one twelfth part to in the solitary *419 *41 qt * cells, to paya fine of 1000 dollars, whereof three-■J fourth parts to be for the use of Carmalt, 'and give security for his good behaviour for seven years, himself in 500I. and two sufficient sureties in 250I. each, and pay costs. Hook was imprisoned for three months, fined one dollar, and to pay the costs of prosecution.
Cited in 6 S. & R-, 225, where it was decided that an indictment for an assault and battery with intent to kill, is not vitiated by slating that the defendant did bite or cut off the ear, etc., the assault and battery with intent to kill being the offense which is punishable, and the injury inflicted merely a circumstance of aggravation.